# ALSTON&BIRD LLP

90 Park Avenue, New York, NY  10016
212-210-9400 - Fax: 212-922-3847 - www.alston.com

John D. Roesser                                        Direct Dial: 212-210-9479                                        Email: john.roesser@alston.com

August 29, 2014

**Via ECF**

Magistrate Judge A. Kathleen Tomlinson
United States District Court – EDNY
814 Federal Plaza
Central Islip, New York 11722

> Re:     *Official Committee of Unsecured Creditors of Exeter Holding, Ltd. v. Linda Haltman, et al., Case. No. 13-cv-05475-JS-AKT*

Dear Judge Tomlinson:

This firm is special litigation counsel for Plaintiff Gary Herbst (the "Plaintiff") in his capacity as plan administrator for the confirmed plan of Exeter Holding, Ltd. ("Exeter"), in the above-captioned proceeding. Plaintiff writes in response to Mr. Weingard's ("Counsel") August 25, 2014 letter motion to vacate the Court's April 14, 2014 order (Docket No. 38), with deadlines later modified by the Court at the August 6, 2014 status conference (the "Order") submitted on behalf of his clients ("Moving Defendants") (Docket No. 59, the "Motion"). After repeated opportunities to seek relief from, or to vacate, the Order and the passage of several months, Defendants bring this Motion just before the deadline for compliance. The Motion is simply the latest episode in their efforts to keep this action from proceeding to trial. Plaintiff respectfully submits that it be denied.

## I.     PLAINTIFF MADE THE BANK STATEMENTS & PROMISSORY NOTES AVAILABLE TO COUNSEL.

On August 21, 2014, Counsel reviewed documents with his client at Plaintiff's offices. See Ex. A. Prior to that meeting, Counsel asked Plaintiff's counsel whether the bank records would be in the books and records turned over to Mr. Herbst when he was appointed as Plan Administrator in July 2013 (the "Exeter Records"). See Exs. B, C. Frankly, Plaintiff's counsel could not understand why they would not be; if Ms. Haltman had produced bank records from the Exeter Records, why would these same records not be contained in the Exeter Records turned over to the Plaintiff? *Id.* But, after no more than four hours reviewing the approximately *twenty* boxes of Exeter Records, Counsel for Ms. Haltman asked *Plaintiff's counsel* why such documents are not found in the Exeter Records. During a later conversation, Plaintiff's counsel explained to Counsel that Plaintiff originally had received incomplete records from Ms. Haltman, forcing Plaintiff to subpoena bank records, and Counsel agreed that he only wanted what Ms. Haltman had produced. See Ex. D. In the end, Counsel turned down our offer for Plaintiff to use estate funds to reconstruct what his client had produced and print it out for his review. *Id.* He stated that if his client had the documents it would be easier for all, and that was the last Plaintiff's counsel heard about the issue until this Motion was filed. *Id.* Plaintiff's counsel *never refused to produce such records* and is currently gathering them for Counsel's review. Again, the real revelation is that the original records are not found in the Exeter Records turned over to Plaintiff.

## II.     PLAINTIFF MADE THE FORENSIC DRIVE AVAILABLE AS COUNSEL PRODUCED IT.

The baseless nature of the Motion cannot be understood without first understanding the history. Several of the Moving Defendants (two of whom were also officers of Exeter) orchestrated the filing of Exeter's "involuntary" bankruptcy in 2011 through a family member. Bankruptcy had been looming for quite some time because Exeter was the target of several NY state court actions filed by creditors. Despite this, the

---

Atlanta • Brussels • Charlotte • Dallas • Los Angeles • New York • Research Triangle • Silicon Valley • Washington, D.C.

August 29, 2014
Page 2

Company's president, Linda Haltman, did nothing to preserve evidence, including the computer on which she conducted all of Exeter's business (the "Exeter Computer" or "Computer"). Plaintiff's counsel did not learn of this serious lapse until August 2012, almost 10 months after the bankruptcy filing. It took another two months for Ms. Haltman to take us seriously, and, in October 2012, at our insistence, Ms. Haltman and Company counsel had a forensic copy of the Computer's hard drive made (the "Forensic Drive"). She then continued to use the Computer until November 2012.

Plaintiff's counsel learned in January 2013—after representations by both Ms. Haltman and her counsel that her failure to preserve was irrelevant because everything was "backed up"—that Ms. Haltman had done nothing to stop the automatic overwriting of those backups and did not even speak with the third party provider, Iron Mountain, until January 2013. As a result, rather than have the Exeter Computer as it existed in November 2011 and earlier back-ups, Plaintiff had the Computer as it existed almost a year later. Plaintiff's counsel subsequently learned that Ms. Haltman's preservation failures were material; Iron Mountain informed us that major deletions had been made, including the deletion of almost 1 GB of data soon after the bankruptcy filing. Further analysis of the Forensic Drive showed significant amounts of data were deleted before and after the bankruptcy filing, much of which could not be restored. It has been no secret that Plaintiff intends to file a motion for sanctions in light of these obvious instances of spoliation and failures to preserve evidence.

When asked, as part of the Defendants' belated compliance with the Order, for a copy of the Forensic Drive, Plaintiff's counsel offered to provide a copy of the Forensic Drive. See Ex. E. This Forensic Drive is in the same format it was when it was produced to us by Counsel who made this Motion. Despite their attempts to pin this on Plaintiff, Plaintiff did not create or produce the Forensic Drive. See Ex. F. Of course, Plaintiff's counsel received the Forensic Drive from Ms. Haltman, had it processed, loaded into an e-discovery review tool, and reviewed the more than 100,000 documents contained thereon. Plaintiff's counsel offered, in exchange for a cost sharing agreement, to give Defendants their own copy of the database, but they were not interested. See Ex. D. Instead—equating cost with impossibility—Defendants threw their hands up and said they could not comply.

Just last week, a few days before the deadline for compliance with the Court's Order, Counsel asked for access to the original Exeter Computer. See Ex. G. He wanted us to set the Computer up with a printer and allow them to open, print, and close original files, thereby changing the metadata and ruining the evidentiary value of the Exeter Computer. See Ex. H. The Computer was produced to Mr. David Blansky of Mr. Herbst's office, who then produced it to an associate of this Firm, who then placed it into a locked location at this Firm. Since leaving Ms. Haltman's possession, the Exeter Computer has never even been turned on, the chain of custody is clear and accounted for, and thus it has significant evidentiary value of the best evidence of Ms. Haltman's spoliation. *Id.* What Plaintiff has done here is what any litigant would do: preserve the best evidence of spoliation and fraud so that the Defendants cannot argue that anything was done to change the evidence or argue that the Forensic Drive is not a true copy of the Exeter Computer. Allowing Defendants to review, and thus change, the best evidence would have constituted professional malpractice.

III.     MOVING DEFENDANTS MADE REPRESENTATIONS WITHOUT KNOWING WHAT WAS CONTAINED IN THE PRIOR PRODUCTIONS.

The Motion and our exchanges with Counsel leading up to it are quite disconcerting. Months ago, Counsel took the position before this Court in opposition to a motion to compel, for which the basis was, to be

August 29, 2014
Page 3

kind, flimsy.  Specifically, Counsel directed that all of the documents Plaintiff's counsel were seeking were part of the Prior Productions and that statement was the basis for the Order to identify which documents in the Prior Productions were responsive to Plaintiff's document requests.  Docket Nos. 26–29.  But now, many months after that position was presented and the Order was entered, Counsel inquired as to the contents of the Prior Productions.  See Exs. C, I.  The only conclusion one can reach, regrettably, is that Defendants did not make a proper investigation before making the representations about the Prior Productions and never intended to review the necessary documents in the time frame set by this Court.  Plaintiff's counsel respectfully submits that the Court should not give them any more leeway than it already has.

## IV.    MOVING DEFENDANTS, NOT PLAINTIFF, HAVE DRIVEN UP LITIGATION COSTS.

Lastly, it is astonishing that the Moving Defendants would intimate that Plaintiff's counsel was somehow attempting to run up litigation costs.  Such a position is at odds with the Plan Administrator's fiduciary duty to preserve estate assets and maximize estate value.  More importantly, Moving Defendants should not cast stones about driving up discovery cost given the significant costs incurred by the estate to address Defendants' spoliation, failure to preserve evidence, and failure to participate in discovery since the inception of this action in 2012.  Significant fees and expenses would have been avoided had:

- The Moving Defendants, particularly Ms. Haltman, preserved evidence;
- The Moving Defendants, particularly Ms. Haltman, not engaged in significant acts of spoliation;
- The Moving Defendants, particularly Ms. Haltman, had produced the Exeter Computer and Forensic Drive upon learning that she did not—as she repeatedly represented—personally own it; or[1]
- The Moving Defendants not forced Plaintiff to execute a confidentiality agreement requiring him to incur significant fees and costs to identify all potentially relevant documents on the Forensic Drive, only to then turn around and completely forego the opportunity to review them.[2]

It is within Moving Defendants' rights to wage a hard fought battle—not including acts of spoliation, making misrepresentations, or failing to comply with their discovery obligations—but doing so and then turning it on Plaintiff is the pot calling the kettle black.

Sincerely,

/s John D. Roesser

cc:    Opposing Counsel (via email)

---

[1] A review of the Forensic Drive revealed the original receipt for the purchase of the Exeter Computer from its manufacturer, a copy of which was apparently obtained soon after Plaintiff's counsel requested the Computer.  Despite Ms. Haltman's numerous representations to Bankruptcy Judge Trust that she owned it, the receipt revealed that she knew at the time that Exeter had in fact purchased the Computer.  Further analysis confirmed that someone, presumably Ms. Haltman, deleted this receipt from the Computer.

[2] In pertinent part, the confidentiality order required Plaintiff to identify potentially relevant documents on the Forensic Drive and afford Defendants with an opportunity to assign confidentiality designations to all of them.  See Docket No. 11 at § 7.  After hiring a vendor to create a database to review the Forensic Drive at a substantial expense to the estate, and after spending a significant amount of time and fees identifying all the potentially relevant documents per the confidentiality order, the Moving Defendants waived their right to assign confidentiality designations.  These are the very same documents they are now seeking.