John D. Roesser
**ARNOLD & PORTER LLP**
399 Park Avenue
New York, New York 10022
(212) 715-1000

*Special Litigation Counsel for*
*Gary Herbst, Plan Administrator for*
*Confirmed Plan of Exeter Holding, Ltd.*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X

In re:                                                        :
                                                              :
EXETER HOLDING, LTD.,                                         :
                                                              :
                            Debtor.                           :
                                                              :
------------------------------------------------------------x :       Case No.:  13-cv-05475-JS-AKT
OFFICIAL COMMITTEE OF UNSECURED                               :
CREDITORS,                                                    :
                                                              :
                            Plaintiff,                        :
                                                              :
            -against-                                         :
                                                              :
LINDA HALTMAN, *et al*,                                       :
                                                              :
                            Defendants.                       :
-------------------------------------------------------------- X

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR
SANCTIONS AND OTHER RELIEF AGAINST ARNOLD FRANK, SONDRA FRANK,
<u>LINDA HALTMAN, MICHAEL HALTMAN, BRUCE FRANK AND LARRY FRANK</u>**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........................................................................................................ iii

Preliminary Statement ............................................................................................................... 1

Facts ......................................................................................................................................... 3

A.     The Complaint .................................................................................................... 3

B.     Exeter ................................................................................................................. 3

C.     Creditors' Suits and Exeter's Bankruptcy ......................................................... 3

        1.     Exeter's Business Model Falters ........................................................... 3

        2.     Exeter Is Sued By Its Creditors and Customers .................................... 4

                a.     The Lawrence Litigations ......................................................... 4

                b.     The Whitney Litigation ............................................................ 5

                c.     The Phlegar Litigation ............................................................. 5

        3.     Exeter Orchestrates Its Own Involuntary Bankruptcy in November 2011 ............ 5

D.     Exeter Fails to Preserve Documents and Destroys Evidence ........................... 6

        1.     Plaintiff's Counsel Learns of Exeter's Failure To Preserve Electronic Documents ............ 6

        2.     Plaintiff's Counsel Learns of Exeter's Failure to Preserve Electronic Mail .......... 7

        3.     Plaintiff's Counsel Learns that Exeter's Assurances of Preservation Are False ............ 8

        4.     Plaintiff's Counsel Learns that Exeter Destroyed Critical QuickBooks Evidence ............ 8

                a.     Larry Frank Deposition ............................................................ 8

                b.     PwC Analysis .......................................................................... 9

                c.     Iron Mountain ......................................................................... 10

E.      Exeter's Pattern of Abuse and Delay in the Discovery Process Continues ................... 10

      1.     Defendants' Discovery Delays Result In Multiple Motions to Compel ............. 10

      2.     The Court Holds Linda Haltman In Contempt ..................................... 11

Argument ...................................................................................................... 11

Point I.  Exeter Engaged In Spoliation And Failed to Preserve Crucial Evidence ..................... 13

A.      Defendants Were Under an Obligation to Preserve Documents................................... 13

      1.     Exeter's Duty To Preserve Documents Arose As Early As 2009 When It Was Sued by the Lawrences ................................................................. 14

      2.     Exeter's Involuntary Bankruptcy Filing ............................................. 15

      3.     Exeter's Myriad Other Litigations ...................................................... 16

B.      Defendants Destroyed Exeter Records That They Had A Duty To Preserve With A Culpable State Of Mind .................................................................. 16

      1.     Mrs. Haltman's Conduct was Willful ............................................... 17

      2.     Exeter's Conduct Is Part of a Long Pattern of Discovery Abuse ........................ 17

            a.     Defendants' Failure To Implement a Ligation Hold Was Grossly Negligent................................................................................ 18

            b.     Defendants' Failure To Suspend Routine Document Destruction and Preserve Relevant Documents Was Grossly Negligent ................... 18

            c.     Defendants' Other Discovery Abuses..................................... 19

C.      The Destroyed Evidence Was Relevant to Plaintiff's Claims ....................................... 20

Point II. Default Judgment Is The Only Adequate Sanction ........................................ 21

Point III. In the Alternative, Plaintiff Is Entitled To An Adverse Inference ............................... 24

Point IV. Additional Sanctions Are Warranted ......................................................... 25

Conclusion ................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

<u>C</u>ASES:

*Alexander v. Boscaino Auto Collision, Ltd.*,
    No. CV-11-3526, 2012 WL 4867507,
    *adopted*, 2012 WL 4867473 (E.D.N.Y. Oct. 15, 2012) ..............................................................23

*Am. Cash Card Corp. v. AT&T Corp.*,
    184 F.R.D. 521 (S.D.N.Y. 1999) ........................................................................................12

*Baez v. Majuri*,
    No. CV-10-3038, 2013 WL 4434444 .................................................................................23

*Bambu Sales, Inc. v. Ozak Trading Inc.*,
    58 F.3d 849 (2d Cir. 1995).................................................................................12, 13, 20

*Byrnie v. Town of Cromwell, Bd. of Ed.*,
    243 F.3d 93 (2d Cir. 2001)...................................................................................................13

*Creative Res. Grp. of New Jersey, Inc. v. Creative Res. Grp.*,
    212 F.R.D. 94 (E.D.N.Y. 2002) ..........................................................................................13

*De Xiong Pan v. Wei Plumbing, Inc.*,
    No. 12 CV 1781, 2013 WL 6053496 (S.D.N.Y. Nov. 13, 2013) ..........................................23

*Fharmacy Records v. Nassar*,
    Nos. 08-1607, 08-2201, 2010 WL 2294538 (6th Cir. June 7, 2010) ....................................23

*Fujitsu Ltd. v. Fed. Express Corp.*,
    247 F.3d 423 (2d Cir. 2001)................................................................................................13

*Gutman v. Klein,*
    No. 03 Civ. 1570, 2008 WL 4682208, (E.D.N.Y. Oct. 15, 2008),
    (*aff'd by Gutman v. Klein*, No. 11–2691–cv(L),
    2013 WL 1136587 (2d Cir. Mar. 20, 2013)................................................................12, 17, 23

*Gutman v. Klein*, No. 03 Civ. 1570,
    2008 WL 5084182 (E.D.N.Y. Dec. 2, 2008) .......................................................................17

*Hickman v. Taylor*,
    329 U.S. 495 (1947)..............................................................................................................1

*In re NTL, Inc. Secs. Litig.*,
    244 F.R.D. 179 (S.D.N.Y. 2007) .........................................................................................16

iii

*In re O'Hara*,
   No. 1:11-CV-0807, 2013 WL 1751001 (N.D.N.Y. Apr. 23, 2013)........................16

*In re Vitamin C Antitrust Litig.*,
   No. 05 Civ. 453, 2013 WL 504257 (E.D.N.Y. Feb. 8, 2013)...................................13

*Kronisch v. United States*,
   150 F.3d 112 (2d Cir. 1998) .....................................................................................24

*Metro Found. Contractors v. Arch Ins. Co.*,
   551 F. App'x 607 (2d Cir. 2014) .............................................................................17

*Microsoft Corp. v. Comp. Care Ctr., Inc.*,
   No. 06-CV-1429, 2008 WL 4179653 (E.D.N.Y. 2008) ...................................20, 23

*Miller v. Time-Warner Commc'ns., Inc.*,
   No. 97 Civ. 7286, 1999 WL 739528 (S.D.N.Y. Sept. 22, 1999) .....................23, 24

*Orbit One Com., Inc. v. Numerex Corp.*,
   271 F.R.D. 429 (S.D.N.Y. 2010) .............................................................................14

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC*,
   685 F. Supp. 2d 456 (S.D.N.Y. 2010)...........................................................17, 19, 25

*Reilly v. Natwest Mkts. Grp. Inc.*,
   181 F.3d 253 (2d Cir. 1999)....................................................................................12

*Residential Funding Corp. v. DeGeorge Fin. Corp.*,
   306 F.3d 99 (2d Cir. 2002)...........................................................................13, 21, 24

*Sekisui Am. Corp. v. Hart*,
   945 F. Supp. 2d 494 (S.D.N.Y. 2013)....................................................................18

*SJS Distrib. Sys., Inc. v. Sam's East, Inc.*,
   No. 11 CV 1229, 2013 WL 5596010 (E.D.N.Y. Oct.11, 2013) .............................18

*Tri-Star Pictures, Inc. v. Unger*,
   171 F.R.D. 94 (S.D.N.Y. 1997) ................................................................................1

*Turner v. Hudson Transit Lines, Inc.*,
   142 F.R.D. 68 (S.D.N.Y. 1991) ..............................................................................14

*West v. Goodyear Tire & Rubber Co.*,
   167 F.3d 776 (2d Cir. 1999)...........................................................................12, 13, 21

*Zimmerman v. Poly Prep Country Day Sch.*,
   No. 09-CV-4586, 2011 WL 1429221 (E.D.N.Y. April 13, 2011).................................. passim

*Zubulake v. UBS Warburg LLC*,
  220 F.R.D. 212 (S.D.N.Y. 2003) ..................................................................................14, 15, 24


**STATUTES, RULES AND OTHER AUTHORITIES:**

3 N.Y.C.R.R. § 410.7(a) ...............................................................................................................16

8 Charles Alan Wright & Arthur R. Miller,
  *Federal Practice and Procedure* § 2001 (3d ed. 2014) .............................................................1

Plaintiff Gary Herbst, solely in his capacity as the plan administrator (the "Plaintiff" or "Plan Administrator") for the confirmed plan of Exeter Holding, Ltd. ("Exeter"), submits this memorandum of law, along with the affidavit of John D. Roesser (the "Roesser Aff.") and the affidavit of Brian T. Fox (the "Fox Aff."), in support of his motion, and moves this Court for an order (1) finding that certain Defendants, Arnold Frank, Sondra Frank, Linda Haltman, Michael Haltman, Bruce Frank and Larry Frank (the "Defendants") engaged in spoliation by failing to preserve evidence; (2) finding that Defendant Linda Haltman engaged in spoliation by destroying evidence; (3) granting a default judgment or, in the alternative, an adverse inference against Defendants; (4) granting Plaintiff reasonable attorneys' fees and costs associated with Defendants' conduct in this regard; and (5) such other relief that the Court deems just and proper.

## PRELIMINARY STATEMENT

Because "[m]utual knowledge of all the relevant facts gathered by both parties is essential to proper litigation," *Hickman v. Taylor*, 329 U.S. 495, 507–508 (1947) (per Murphy, J.), "every party to a civil action is entitled to the disclosure of all relevant information in the possession of any person, unless the information is privileged." *See Tri-Star Pictures, Inc. v. Unger*, 171 F.R.D. 94, 101 (S.D.N.Y. 1997) (quoting 8 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2001 (3d ed. 2014)).

Here, however, Defendants have gone out of their way to impede discovery and frustrate Plaintiff's search for relevant facts. Throughout the discovery process, Defendants have been non-responsive, operated under an apparent belief that the discovery rules do not apply to them, and blatantly attempted to shift the burden and cost of compliance with their discovery obligations to Plaintiff. But, even more disturbing and damaging—to both Plaintiff and the legitimacy of the process—Defendants made no effort to preserve relevant documents. As

officers and directors of Exeter, they had an obligation to do so and to ensure that routine

document deletion was suspended.  They did neither of these things and, consequently, a great

number of relevant documents were destroyed.  But it gets worse: the president of the company,

Linda Haltman, *deliberately destroyed and altered crucial documents and information*.  And

then she tried to cover it up.

All in all, Plaintiff is aware of the following sanctionable conduct by Defendants:

- Linda Haltman asked her brother Larry Frank to alter and backdate QuickBooks entries, deliberately misstating Exeter's financial records.

- Defendants were grossly negligent in fulfilling their document preservation duties by failing to implement a litigation hold and failing to suspend routine deletions of Exeter's web-based emails and data back-ups when faced with creditor litigation, bankruptcy, or this action.

- Linda Haltman deleted more than 46,000 files, including QuickBooks entries, from the hard drive on which Exeter transacted business and stored its documents (the "Hard Drive") between 2011 and 2012.  Deletion activity was especially high in September and November 2011, just before and after the bankruptcy filing.

- Despite the fact that the Hard Drive contained the *only* copy of Exeter's books and records (*i.e.,* QuickBooks), for eleven months following the petition, Linda Haltman continued to use and revise QuickBooks without any reliable preservation methods in place, tampering with relevant evidence.

- Defendants failed to timely produce relevant documents and then asserted that the documents had already been produced.[1]

- Linda Haltman was held in contempt after repeatedly disrupting depositions, in several instances, after the Court had explicitly instructed her not to.

While a default judgment is a harsh sanction, it is appropriate here pursuant to the

inherent powers of this Court in light of Defendants' utter failure to take their discovery

obligations seriously and their willful destruction and alteration of relevant documents.  This

behavior, in particular the timing and large volume of deletions, leads inexorably to the

---

[1]   This conduct is the subject of several motions to compel.

conclusion that documents and information were destroyed in order to keep them out of creditors' hands.  Defendants' pattern of misconduct warrants nothing less than the harshest sanction.

FACTS

**A.    THE COMPLAINT**

Plaintiff brought this action against Exeter's various insiders, several of their children and grandchildren, trusts held for the insiders' benefit, and various property corporations owned by the Haltmans and the Franks.  Plaintiff has alleged fraud and fraudulent transfers, preferential transfers, breaches of fiduciary duty, and corporate waste, all of which occurred between January 1, 2006 and the involuntary bankruptcy filing on November 9, 2011.

**B.    EXETER**

Exeter, a closely-held and family run corporation founded in 1986 by Defendant Arnold Frank, was owned by Defendants Mr. Frank and his wife Sondra Frank.  Roesser Aff., Ex. 1 at 172:19-173:15; 207:8-16.  Mr. Frank was chairman of the company, Mrs. Frank was given the title of Exeter's corporate secretary, and Mrs. Haltman was president.  *Id.*, at 26:3-16; Ex. 2 at 16:5–8.  In addition, Exeter's board of directors included Mrs. Haltman's husband, Michael Haltman, who also served as a vice president, Bruce Frank, and Larry Frank.  Roesser Aff., Ex. 2 at 197:8–16; Ex. 4.  As president of Exeter, Mrs. Haltman maintained Exeter's books and records.  Roesser Aff., Ex. 1 at 106:6–9; Ex. 5.

**C.    CREDITORS' SUITS AND EXETER'S BANKRUPTCY**

**1.    Exeter's Business Model Falters**

Exeter was a "hard money lender" that lent construction funds to builders and contractors.  Roesser Aff., Ex. 1 at 229:13–5; Ex. 2 at 133:16–134:11; Ex. 6.  For a while, it was moderately successful.  But from 2000 to 2006, mortgage loans were easy to come by as

3

underwriting rules were loosened and the demand for hard money lenders withered.  Roesser

Aff., Ex. 7.  At that time, without telling anyone, and motivated primarily by their need to sustain

their lifestyle, Defendants changed Exeter's business model, entering into speculative

homebuilding just as the bottom was about to fall out of the market.  Indeed, this new business

model led the insiders to transfer money from Exeter to property corporations that were set up in

the name of the particular homebuilding project (the "Property Corporations"), and owned by

one or more of the Defendants, not Exeter.  As time went on, it became apparent that Exeter had

failed; Exeter's long-time secretary, Anna Cincinnato, noted that by 2008 Exeter was no longer

in business because it was "bankrupt" and Bruce Frank expressed his belief in April 2009 that

Exeter's business should be valued at "0."  Roesser Aff., Ex. 8 at 62:9–12; Ex. 9.

## 2.   **Exeter Is Sued By Its Creditors and Customers**

### a.    *The Lawrence Litigations*

Not surprisingly, as Exeter's business model fell apart, creditors came calling.  On

December 7, 2009, the Lawrences, a group of Exeter's non-bank lenders,[2] sued on promissory

notes issued by Exeter.  Roesser Aff., Ex. 10 at 8.  As part of the suits, the Lawrences served a

subpoena on Exeter on November 9, 2010 asking for "testimony and production of documents

concerning [Exeter's] assets, including loans made by [Exeter]."[3]  Roesser Aff., Ex. 11.

However, on June 8, 2011, the court found that Exeter had failed to produce "documents

concerning loans to [its] officers and directors" and ordered those documents produced.  *Id.*

After further delay by Exeter, the Lawrences made a motion to renew their motion for contempt,

---

[2]    Exeter would normally use a combination of bank loans, personal funds from family members, and funds lent to Exeter by individuals and entities ("Non-Bank Lenders") to fund its business.  In exchange for lending money to Exeter, the Non-Bank Lenders received notes from Exeter's general fund account.

[3]    Interestingly, this first order to compel the production of documents is just two months before Mrs. Haltman asked her brother to backdate QuickBooks entries.  *See infra*, Facts § D.4.a.

and on September 16, 2011, the court again ordered the production of relevant insider loan

documents to the extent not already produced.  Roesser Aff., Ex. 12.

> b.     The Whitney Litigation

On January 14, 2011, another pair of Non-Bank Lenders, Leslie and Peter Whitney, sued

on promissory notes issued by Exeter.  Roesser Aff., Ex. 13.  As in the Lawrence litigation,

Exeter's books and records were a specific subject of discovery.  Roesser Aff., Ex. 14 at 48:13-

21.

> c.     The Phlegar Litigation

On May 2, 2011, Jeffrey and Nancy Phlegar filed an amended complaint against Exeter,

one of the Property Corporations, and Linda and Michael Haltman, over defects in workmanship

on a home that Exeter had sold to the Phlegars.  Roesser Aff., Ex. 15.  The Phlegars alleged that

though the Defendants had represented that Exeter was "a financially secure, viable, sound, and

commercially responsible entity[,]" those representations were false.  *Id.*, at ¶¶ 52, 54.  Here

again, Exeter's financial records were relevant to the litigation.

### 3.     Exeter Orchestrates Its Own Involuntary Bankruptcy in November 2011

In 2011, after having contemplated bankruptcy for nearly two years,[4] Linda Haltman and

her husband Michael orchestrated the filing of Exeter's involuntary bankruptcy.  They asked

Michael's brother-in-law, Ken Haltman, to file the involuntary petition as a "favor," with Exeter

ultimately paying for it.  Roesser Aff., Ex. 17 at 140:7-21, 166:8-21; Ex. 18 (receipts of money

orders sent from Michael Haltman to his brother to pay attorney fees associated with the

involuntary filing).  On November 9, 2011, Ken Haltman filed the petition.

---

[4]     So as to avoid any potential judgments, Defendants began to consider bankruptcy as early as 2009 after the Lawrences filed their motions for summary judgment in lieu of complaints.  *See* Roesser Aff., Ex. 16.

Even early in the bankruptcy, it was clear that Exeter's books and records would be relevant. For example, Mrs. Haltman was questioned about Exeter's recordkeeping related to the insiders' "loan accounts" in one of the Section 341 meetings of Exeter's creditors shortly after the bankruptcy was commenced. Roesser Aff., Ex. 19 at 118:19-123:24.

**D.     EXETER FAILS TO PRESERVE DOCUMENTS AND DESTROYS EVIDENCE**

Despite being involved in multiple litigations with creditors and customers starting in late 2009, filing for bankruptcy in late 2011, and being subject to motions to compel related to Exeter's failure to produce relevant financial documents, the officers and directors of Exeter (*i.e.,* Defendants), made no effort to preserve documents until October 2012. Until that time, Mrs. Haltman had not preserved, and continued to modify, the sole Exeter computer on which the only copy of critical books and records were maintained. Further, no efforts were made to suspend automatic deletions by Exeter's email provider or its computer back-up service provider until January 2013, *more than one year* after the bankruptcy was commenced. Worse still, prior to that, Mrs. Haltman deliberately tampered with and destroyed relevant evidence.

**1.     Plaintiff's Counsel Learns of Exeter's Failure To Preserve Electronic Documents**

In September 2012, Plaintiff's counsel learned for the first time that Exeter had done nothing to preserve evidence on the computer on which Exeter business was transacted, the sole computer having the all important QuickBooks, or anywhere else for that matter. Roesser Aff., Ex. 20. Indeed, Mrs. Haltman continued to use the computer for more than ten months after the bankruptcy filing.

On September 7, 2012, Plaintiff's counsel asked that the computer be removed from Mrs. Haltman's possession and forensically copied immediately, but Defendants argued that the computer belonged to Mrs. Haltman individually, not to Exeter, despite the fact that she had

earlier testified that it belonged to Exeter.  Roesser Aff., Ex. 21.  Unbeknownst to Plaintiff's

counsel at the time, Mrs. Haltman had received a copy of the receipt for the computer that

proved that it had been sold to Exeter.  Roesser Aff., Ex. 22.  Rather than turn the receipt over to

Plaintiff's counsel or, better yet, turn over the computer, Mrs. Haltman withheld the invoice and

continued to argue that the computer belonged to her.  Mrs. Haltman's personal counsel, Marc A.

Pergament, further argued that since there had been "no order issued nor a notice requiring the

preservation of material," there was no reason that "the information on the computer should have

been preserved about ten (10) months ago."[5]  Roesser Aff., Ex. 21.  While the ownership dispute

waged on, Plaintiff's counsel was successful in convincing Exeter to at least make a forensic

copy of the Hard Drive in October 2012.  Committee counsel also repeatedly requested that

information be preserved.  *See, e.g.*, Roesser Aff., Ex. 23.

### 2.   <u>Plaintiff's Counsel Learns of Exeter's Failure to Preserve Electronic Mail</u>

At about the same time, Plaintiff's counsel learned for the first time that Exeter had not

preserved electronic mail.  GoDaddy, an online email service provider, provided Exeter's email.

Roesser Aff., Ex. 24 at 99:17-100:5.  Pursuant to GoDaddy's standard retention policy, it "can

only provide the ability to restore emails saved on our servers for 30 days and email needed

before tha[t] time is the responsibility of the customer to backup or archive."  Roesser Aff., Ex.

25.  During a January 2013 call with GoDaddy, GoDaddy stated that no one from Exeter ever

instructed it to suspend its standard deletion policy. Roesser Aff., ¶ 3.  As Mrs. Haltman stated

herself, "[w]e don't save or back-up our old emails."  Roesser Aff., Ex. 25.

---

[5]   Plaintiff's counsel responded by reminding Mr. Pergament that "Exeter and Ms. Haltman had
an obligation to preserve the moment they had notice that evidence was relevant to litigation or
should have known that the evidence may be relevant to future litigation; no notice by anyone
was required."  Roesser Aff., Ex. 23.

3.     **Plaintiff's Counsel Learns that Exeter's Assurances of Preservation Are False**

Exeter—unfazed by its failure to preserve—stated that all relevant information had been preserved and nothing had been destroyed:  Mrs. Haltman deletes nothing, and the Exeter computer was regularly backed up by Iron Mountain, so if had been deleted or changed, it could be obtained from the backup.  Roesser Aff., Ex. 24 at 138:23-139:2; Ex. 26.  Both of these assertions turned out to be false.

During the January 2013 deposition, Mrs. Haltman admitted that she:

- Never instructed GoDaddy to preserve Exeter emails in the entire time Exeter used GoDaddy;

- Never instructed Verizon to preserve voicemails that she received on her blackberry; and

- Never spoke to Iron Mountain or GoDaddy in connection with the Lawrence actions or in connection with the bankruptcy filing.[6]

After this deposition, Plaintiff's counsel, Debtor's counsel, and Mrs. Haltman spoke with Iron Mountain.  Iron Mountain stated that no one from Exeter had requested any changes to its standard deletion policies where only the last 10 back-ups are preserved; thus, all Exeter back-ups from before 2013 had been deleted.  Roesser Aff., ¶ 4.

4.     **Plaintiff's Counsel Learns that Exeter Destroyed Critical QuickBooks Evidence**

    *a.     Larry Frank Deposition*

Just weeks after the court in the Lawrence litigation compelled the production of Exeter's financial documents related to insider loans, Mrs. Haltman asked her brother Larry Frank to change and backdate certain entries in Exeter's QuickBooks.  Roesser Aff., Ex. 27 at 48:23-

---

[6]   *See* Roesser Aff., Ex. 24 at 108:5-7, 18-21; 117:8-118:12; 138:19-22; 140:14-19; 145:14-146:9.  In fact, she testified that she had never spoken to Iron Mountain since she started using the service in 1998 (*Id*., at 122:5-25).

60:14.  Specifically, on July 29, 2011, Mrs. Haltman asked her brother to "start by writing off the following accounts to zero."  Roesser Aff., Ex. 28.  On August 10, 2011, Larry responded that he had "closed all the accounts that you gave me into the bad debts account.  Millfarm[7] was given a negative amount, so it was closed out as a credit to bad debt.  Print and review the bad debt account with all the posting dated 8/10/2011."  Mrs. Haltman's response was simple: "You were supposed to do it as of 9/30/2010[,]" that is, set the posting date to nearly one year prior to the date the email was sent and just weeks before the original Lawrence subpoena was served.[8]  *Id*.

       b.   *PwC Analysis*

In the fall of 2013, Plaintiff retained PricewaterhouseCoopers LLP ("PwC") to perform a forensic analysis on a copy of the Hard Drive.  PwC determined that 17.03 GB, containing 64,084 files, had been deleted from the Hard Drive between January 2004 when the computer was purchased and October 2012 when the copy was made.  Fox Aff., ¶ 7.  Of those files, 46,623 were deleted in 2011 and 2012.  *Id*.  Thus, more than two thirds of the total deletions occurred in the two-year window when Exeter was being sued by multiple creditors and going through bankruptcy.  In addition, 29,184 of the deleted files are unrecoverable through ordinary forensic means, 46,623 of which were deleted between 2011 and 2012.  *Id*.  Further, an extraordinary number of files were deleted in September and November 2011  (20,680 and 10,703 deleted files, respectively).  Fox Aff., ¶ 8.  Finally, PwC determined that there were substantially more QuickBooks files deleted on November 21, 2011 than on other days.  Fox Aff., ¶ 9.

---

[7]   29 Mill Farm Lane Corp. was one of the defendants named in the Phlegars' amended complaint, filed May 2, 2011.

[8] Larry Frank repeatedly testified he was never given any reason for the backdating and did not know why he did it.  Roesser Aff., Ex. 27 at 52:15-18, 57:11-14, 60:11-14.

c.    *Iron Mountain*

During a call in January 2013 with Iron Mountain, the Committee, and Mrs. Haltman, Plaintiff learned that approximately 1 GB of data had been deleted from Mrs. Haltman's Hard Drive; Iron Mountain knew this because certain back-ups performed, including one from late December 2011, just weeks after the filing of the involuntary petition, showed a substantial decrease in size. Iron Mountain concluded, therefore, that data had been deleted from the Hard Drive at that time, resulting in a substantially smaller back-up.

**E.    EXETER'S PATTERN OF ABUSE AND DELAY IN THE DISCOVERY PROCESS CONTINUES**

Undeterred by the flurry of revelations regarding Exeter's preservation shortcomings, Mrs. Haltman—just weeks after her 30(b)(6) deposition—advised her brother Larry Frank that "in the future it is safer for you to use my other email address lhaltman@hallmarkabstractllc.com." Roesser Aff., Ex. 27 at 252:12-17; Ex. 29. Sadly, this would not be the last example of the Defendants' attempts to evade their discovery obligations.

**1.    Defendants' Discovery Delays Result In Multiple Motions to Compel**

Plaintiff served requests for production of documents on all Defendants on May 30, 2013. As a result of Defendants' discovery failures, on February 18, 2014, Plaintiff filed several letter motions seeking to compel Defendants' compliance with their discovery obligations. On March 24, 2014, Linda Haltman unequivocally testified that she had turned over all Exeter files and had maintained copies of documents already turned over to the Plan Administrator at Exeter's former offices. Roesser Aff., Ex. 1 at 157:24-158:7. She further unequivocally testified that she had produced "all documents in [her] possession [sic], custody, or control to the [Plaintiff]." *Id.*, at 33:25-34:4. In objecting to Request No. 8 (concerning the Haltman's alleged investment in Exeter) of the motion to compel, Mrs. Haltman's counsel reaffirmed her position, objecting that the Haltmans did not possess any responsive documents. *See* Dkt. No. 28. Despite these

10

repeated assurances that all documents had been produced and that there was nothing else to produce, in or around September 2014, Mrs. Haltman produced ***eight (8) additional boxes of documents*** to Plaintiff, including the promissory notes and bank statements that Defendants had claimed to not have and six boxes of property corporation documents not previously produced.

Defendants also took the position that documents responsive to the requests were contained in prior productions, so the Court ordered them to identify with specificity which documents were responsive to each discovery request.  *See* Dkt. No. 38.  Although some documents have been identified, Plaintiff is still awaiting final lists of responsive documents from Defendants and believes that significant categories of documents have not yet been produced.

### 2.      The Court Holds Linda Haltman In Contempt

Linda Haltman coached witnesses during several depositions and had to be instructed by the Court to stop.  Roesser Aff., Ex. 8 at 68:8–13.  Despite assuring the Court that she would no longer interfere, she disregarded the Court's order at two subsequent depositions.  Roesser Aff., Ex. 30 at 124:11, 288:4–16.  In August 2014, Plaintiff was forced to file a civil contempt motion, which the Court granted in part on December 24, 2014, precluding Mrs. Haltman from appearing in person at future depositions.  *See* Dkt. No. 82.  Mrs. Haltman's "utter non-compliance with this Court's prior Orders" also led to a  $2,500 fine.  *Id.*

### ARGUMENT

Defendants have engaged in a pattern of spoliation, spanning more than four years and characterized by willful destruction and failures to preserve evidence.  The backdating of QuickBooks entries just before it became necessary to produce them and then the deletion of the earlier versions of QuickBooks is but one example of Exeter's egregious behavior.  Indeed, Mrs. Haltman has not only engaged in such behavior, she has repeatedly attempted to cover it up.

11

In such a situation, "[t]rial judges should have the leeway to tailor sanctions to insure that [the Defendants] do not benefit from their wrongdoing—a remedial purpose that is best adjusted according to the facts and evidentiary posture of each case." *Reilly v. Natwest Mkts. Grp. Inc.*, 181 F.3d 253, 267 (2d Cir. 1999). Appropriate sanctions should "(1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position [it] would have been in absent the wrongful destruction of evidence by the opposing party." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999) (internal quotations & citation omitted).

Here, where the Defendants willfully altered QuickBooks, willfully destroyed relevant documents, and were grossly negligent in failing to preserve relevant evidence, the only appropriate sanction is a default judgment. *See, e.g., Gutman v. Klein,* No. 03 Civ. 1570, 2008 WL 4682208, at *12 (E.D.N.Y. Oct. 15, 2008) (report and recommendation) (recommending that a default judgment be entered against the defendants, because "lesser sanctions such as adverse inferences are ill-suited to a case like this, where the spoliator has, in bad faith, irretrievably deleted computer files that likely contained important discovery information") (citations omitted), (*aff'd by Gutman v. Klein*, No. 11–2691–cv(L), 2013 WL 1136587 (2d Cir. Mar. 20, 2013)).

Defendants' long history of non-compliance with discovery obligations warrants such a "harsh" sanction. *See, e.g., Am. Cash Card Corp. v. AT&T Corp.*, 184 F.R.D. 521, 524-525 (S.D.N.Y. 1999) (imposing the "litigation ending sanction" of default judgment against plaintiff where plaintiff had repeatedly and willfully failed to comply with its discovery obligations); *cf. Bambu Sales, Inc. v. Ozak Trading Inc.*, 58 F.3d 849, 853 (2d Cir. 1995) ("Although entry of a default judgment is an extreme measure, discovery orders are meant to be followed. . . . If one

12

suggests that our decision today is strong medicine, that is precisely what it is intended to be.")

(internal quotations & citations omitted).

### POINT I.
#### EXETER ENGAGED IN SPOLIATION AND FAILED TO PRESERVE CRUCIAL EVIDENCE

"Spoliation is the destruction or significant alteration of evidence, or the failure to

preserve property for another's use as evidence in pending or reasonably foreseeable litigation."

*West,* 167 F.3d at 779 (citation omitted).  A party bringing a spoliation claim must demonstrate:

> (1) that the party having control over the evidence had an
> obligation to preserve it at the time it was destroyed; (2) that the
> [evidence was] destroyed with a culpable state of mind; and
> (3) that the destroyed evidence was relevant to the party's claim or
> defense such that a reasonable trier of fact could find that it would
> support that claim or defense.

*Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002) (internal

quotation marks and citation omitted).  Each of these elements is met here.

### A.    Defendants Were Under an Obligation to Preserve Documents

"The obligation to preserve evidence arises when the party has notice that the evidence is

relevant to litigation or when a party should have known that the evidence may be relevant to

future litigation."  *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001) (citation

omitted).  The duty to preserve arises when litigation is "reasonably foreseeable."  *Byrnie v. Town

of Cromwell, Bd. of Ed.*, 243 F.3d 93, 107 (2d Cir. 2001).[9]

The Defendants are all officers and directors of Exeter.  Roesser Aff., Ex. 2 at 16:5-8,

197:8–16; Ex. 4.  A corporation such as Exeter can act only through its officers and directors,

---

[9]    *See also, In re Vitamin C Antitrust Litig.*, No. 05 Civ. 453, 2013 WL 504257, at *9 (E.D.N.Y.
Feb. 8, 2013) ("[T]he law is clear that the obligation to preserve evidence arises when the party
has notice that the evidence is relevant to litigation, and that this obligation may arise prior to the
filing of a suit if the litigation is reasonably anticipated.") (internal quotations & citation
omitted); *Creative Res. Grp. of New Jersey, Inc. v. Creative Res. Grp.*, 212 F.R.D. 94, 106
(E.D.N.Y. 2002) (concluding that the duty to preserve arose months prior to the commencement
of the lawsuit when the problems that eventually led to the filing of the lawsuit first surfaced).

and thus the obligation to preserve documents is theirs and the failure to do so is their gross negligence.  *See, e.g., Orbit One Com., Inc. v. Numerex Corp.*, 271 F.R.D. 429, 438 (S.D.N.Y. 2010) ("[W]here the client is a business, its managers, in turn, are responsible for conveying to their employees the requirements for preserving evidence.") (citation omitted).[10]

As officers and directors of Exeter, Defendants' obligation to preserve documents arose out of any of three circumstances, each of which predates Defendants' spoliation and willful destruction of documents:  (1) the anticipation of litigation based on claims of the same nature as Plaintiff's as early as December 2009 when Exeter was sued by its Non-Bank Lenders; (2) the contemplation of bankruptcy in late 2009 and the orchestration of the filing of involuntary bankruptcy by Kenneth Haltman in November 2011, which required Exeter to maintain documents and anticipate litigation; and (3) Exeter's frequent involvement in litigations and foreclosures.

### 1.  Exeter's Duty To Preserve Documents Arose As Early As 2009 When It Was Sued by the Lawrences

On December 7, 2009, when the Lawrences sued Exeter (Roesser Aff., Ex. 10 at 8), Defendants were obligated to preserve all documents that they knew or should have known were potentially relevant to the Lawrences' claims.  *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003) (a litigant is "under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request.") (internal quotations and footnote omitted).  Because the Lawrences' claims

---

[10]   *See also Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 73 (S.D.N.Y. 1991) ("The obligation to retain discoverable materials is an affirmative one; it requires that the agency or corporate officers having notice of discovery obligations communicate those obligations to employees in possession of discoverable materials.") (citation omitted).

related to Exeter's ability to fulfill its financial obligations, it was reasonably foreseeable that Exeter's financial books and records would be relevant to the pending suits; Exeter was thus obligated to preserve such records at that point.  *Id.*

Furthermore, the Lawrences' claims were not unique to them, but were applicable to *any* of Exeter's creditors, including the Plaintiff.  Similarly, the documents relating to Exeter's assets, including loans made by the defendants, are germane to Plaintiff's claims and to those of any other creditors.  "[D]efendants and their counsel … were [therefore] on notice that other potential plaintiffs existed."  *Zimmerman v. Poly Prep Country Day Sch.*, No. 09-CV-4586, 2011 WL 1429221, at *19 (E.D.N.Y. April 13, 2011) (finding that defendants had a continuing obligation to maintain notes relevant to future claims even after the initial lawsuit was finished when it was on notice that other potential plaintiff existed).

One way or another, Exeter's duty to preserve financial records surely attached on November 9, 2010 when those records became "the subject of a pending discovery request."[11] *Zubulake*, 220 F.R.D. at 217.

### 2.    Exeter's Involuntary Bankruptcy Filing

Defendants appear to have been considering bankruptcy by the end of 2009 (Roesser Aff., Ex. 16), at which point they reasonably should have foreseen the possibility of creditor litigation.  But at the very latest, Exeter's duty to preserve documents arose on November 9, 2011 when Kenneth Haltman submitted the involuntary petition on Defendants' behalf.[12]  At that point, Exeter and Defendants had every reason to anticipate creditor litigation and were under an

---

[11]   On November 9, 2010, the Lawrences served a subpoena on Exeter asking for "testimony and production of documents concerning defendant's assets, including loans made by defendant."  Roesser Aff., Ex. 11.  It would take two court orders to get Exeter to produce these documents.  *Id.*, Ex. 12.

[12]   The involuntary petition was involuntary in name only, given that it was orchestrated by Linda and Michael Haltman and paid for by Exeter.  *See supra*, Facts § C.3.

obligation to ensure that material potentially relevant to any future claims was preserved. In addition, federal bankruptcy law requires debtors to preserve their business records. *See, e.g., In re O'Hara*, No. 1:11-CV-0807, 2013 WL 1751001, at *6 (N.D.N.Y. Apr. 23, 2013) ("[t]he language of 11 U.S.C. § 727(a)(3) requires more than just the preservation of business records; it places an affirmative duty on the debtor to create books and records accurately documenting his business affairs") (internal quotations & citations omitted).[13]

### 3. Exeter's Myriad Other Litigations

Neither the creditor litigations nor the bankruptcy was the first time Exeter had been engaged in litigation. In fact, litigation was fairly common for the company. In addition to the "voluminous" number of law suits to which Exeter was a party, the company was a plaintiff in "many" foreclosure actions, and brought "many" suits against title companies. Roesser Aff., Ex. 1 at 170:8-171:15; Ex. 2 at 10:20-12:20. Arnold Frank testified that "[o]f course, we had to submit some documents against the title companies. We had to submit our books and records." Roesser Aff., Ex. 2 at 170:17-171:3. As such, Defendants had an obligation to preserve those books and records and any related to pending or anticipated future litigation.

### B. Defendants Destroyed Exeter Records That They Had A Duty To Preserve With A Culpable State Of Mind

"The culpable state of mind requirement is satisfied in this circuit by a showing of ordinary negligence." *In re NTL, Inc. Secs. Litig.*, 244 F.R.D. 179, 198 (S.D.N.Y. 2007). Defendants' conduct exceeds this requirement, ranging from grossly negligent to willful.

---

[13] As a licensed mortgage banker, Exeter was also required to maintain its records for a period of three years under New York law. 3 N.Y.C.R.R. § 410.7(a).

### 1.      Mrs. Haltman's Conduct was Willful

"[T]he intentional destruction of relevant records, either paper or electronic, after the duty to preserve has attached, is willful."  *See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC*, 685 F. Supp. 2d 456, 464 (S.D.N.Y. 2010) (citing *Gutman v. Klein*, No. 03 Civ. 1570, 2008 WL 5084182 (E.D.N.Y. Dec. 2, 2008) (adopting finding of the magistrate judge that spoliator acted in bad faith by intentionally deleting computer files)).

Mrs. Haltman's willful destruction of evidence is precisely the type of conduct that warrants a default judgment.  *See, e.g., Gutman* , 2008 WL 4682208, at *12.  *First,* Mrs. Haltman asked her brother Larry Frank to tamper with QuickBooks entries and backdate Exeter's financial records by nearly a year while Exeter was actively involved in litigation with creditors, those very documents were the subject of an order to compel, and Exeter was considering bankruptcy.  Roesser Aff., Ex. 27 at 48:23-60:14; Ex. 28.  *Second,* Mrs. Haltman deleted massive amounts, 17 GB, of data from the Hard Drive around the time when the bankruptcy was filed.  Mrs. Haltman testified that to her knowledge no one had access to her computer except for her (Roesser Aff., Ex. 1 at 44:24-45:2), and thus it is only logical to assume that she deleted the material herself.   This destruction was willful, deliberate and in bad faith, satisfying the culpability requirement.

### 2.      Exeter's Conduct Is Part of a Long Pattern of Discovery Abuse

Mrs. Haltman's spoliation is also part of a larger pattern of abuse of the discovery process so as to warrant a default judgment.  *See Metro Found. Contractors v. Arch Ins. Co.*, 551 F. App'x 607, 609-11 (2d Cir. 2014) (summary order) (affirming dismissal of litigant's claims in light of litigant's "dilatory behavior and continual disrespect for district court orders . . . .").

      a.    *Defendants' Failure To Implement a Ligation Hold Was Grossly Negligent*

    "[O]nce a party reasonably anticipates litigation it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents." *Zimmerman,* 2011 WL 1429221, at \*15 (citation omitted). While the failure to put in place a litigation hold is not *per se* gross negligence, Defendants' "failure to take even the most basic document preservation steps … constitutes gross negligence." *SJS Distrib. Sys., Inc. v. Sam's East, Inc.*, No. 11 CV 1229, 2013 WL 5596010, at \* 4 (E.D.N.Y. Oct.11, 2013); *Sekisui Am. Corp. v. Hart*, 945 F. Supp. 2d 494, 507-08 (S.D.N.Y. 2013) (holding that where the facts are egregious, the failure to timely institute a litigation hold constitutes gross negligence).

    None of Exeter's officers and directors made any attempt to institute a litigation hold despite being under an obligation to do so since November 2009. Both Arnold Frank and Mrs. Haltman testified that Exeter did not have any document retention policy. Roesser Aff., Ex. 1 at 159:23-25; Ex. 2 at 14:21-24. At a minimum, documents of Exeter's president, who was handling "100% of the duties and responsibilities of the company" as of January 2010 (Roesser Aff., Ex 31), should have been placed "on hold" and preserved. The failure to do so through a written document hold constitutes gross negligence on the part of Exeter's officers and directors.

      b.    *Defendants' Failure To Suspend Routine Document Destruction and Preserve Relevant Documents Was Grossly Negligent*

    The court in *Zimmerman* was wise when it said that the failure to implement a written litigation hold is gross negligence because it is "likely to result in the destruction of relevant information." *Zimmerman*, 2011 WL 1429221, at \*22. That is precisely what happened in this case.

Once the duty to preserve has attached, the failure to "identify all of the key players and to ensure that their electronic and paper records are preserved[,]" the failure "to cease the deletion of email[,]" and the failure "to preserve backup tapes when they are the sole source of relevant information or when they relate to key players, if the relevant information maintained by those players is not obtainable from readily accessible sources" have all been held to be grossly negligent. *See Pension Comm.,* 685 F. Supp. 2d at 477; *see also Zimmerman*, 2011 WL 1429221, at *22 ("[T]he failure to collect and preserve records from key players constitutes gross negligence.") (internal citation omitted).

Exeter, through its officers and directors, was under a duty to preserve documents relevant to its ongoing creditor litigations and suspend routine document destruction since as early as 2009. Yet: (1) no one ever preserved or requested that GoDaddy stop the automatic deletion of Exeter's internet-based email; (2) no one ever requested that Iron Mountain stop automatically over-writing the back-up copies of the Hard Drive on which Exeter transacted business and stored its documents; and (3) no one preserved, for almost a full year after the filing of the petition, the Hard Drive, which contained the *only* record of Exeter's financials on the QuickBooks program. As a result of these failures, the back-ups maintained by Iron Mountain for the relevant period were overwritten, emails were routinely deleted by GoDaddy, and the QuickBooks entries were compromised. The failure to implement adequate document retention policies also allowed Linda Haltman to delete more than 46,000 files from the Hard Drive in 2011 and 2012. Fox Aff., ¶ 7. Accordingly, Defendants were grossly negligent in carrying out their preservation duties.

    c.    *Defendants' Other Discovery Abuses*

The entire discovery process has been treated as a shell game by the Defendants, with Plaintiff having to guess what material exists, where it is, and then compel Defendants to

19

produce it.  Although by no means an a comprehensive list, the following examples are
emblematic:

- Mrs. Haltman's testimony that she had not deleted documents followed by Plaintiff's discovery that she, in reality, had.  Fox Aff., ¶ 7.
- Mrs. Haltman's testimony that the Hard Drive belonged to Exeter in 2010 but then claiming that it belonged to her personally in 2012 when she wanted to avoid producing documents.  Roesser Aff., Ex. 23.
- Mrs. Haltman's representation at her March 24, 2014 deposition that she and the Defendants had turned over all relevant material to Plaintiff only to "discover" almost five months later eight additional boxes of documents, including promissory notes that Defendants claimed not to have in their possession. Roesser Aff., Ex. 32.

Defendants' delays have also led Plaintiff to file a number of letter motions to compel
that remain unresolved almost two years after Plaintiff served its discovery requests and Mrs.
Haltman's repeated coaching of witnesses at depositions have gotten her sanctioned by the
Court.  Such games subvert the purpose of discovery and are grounds for a default judgment.
*See, e.g., Bambu Sales, Inc.*, 58 F.3d at 853; *Microsoft Corp. v. Comp. Care Ctr., Inc.*, No. 06-
CV-1429, 2008 WL 4179653, at *1, *4, *17 (E.D.N.Y. 2008) (adopting magistrate's report and
recommendation that default judgments be entered against defendants, where  "a continuing saga
of dilatory conduct [met] the threshold for entering a default judgment order under Rule 37")
(citation omitted).

**C.**     **The Destroyed Evidence Was Relevant to Plaintiff's Claims**

The QuickBooks entries, emails, and financial documents maintained on the Hard Drive
are the only record of many of the transactions that underlie all of Plaintiff's claims.  This is not
a case where there was damage to one out of a thousand, or a hundred, or even ten computers
where relevant information was stored; rather, this was quite literally the *only* computer that
housed Exeter's critical QuickBooks entries and financial records.  Roesser Aff., Ex. 1 at 106:6-
12, 123:20-127:19 ("There would be a Quick Book entry" for all payments to insiders."), 165:4-

20

20 ("[I]f we ever needed something we could get it from Quick Books. So there was no real reason to retain any hard copies of things."); Ex. 24 at 41:8-15 (records of Exeter's payment of personal expenses would be kept on QuickBooks and nowhere else). Accordingly, the destroyed evidence was not only highly relevant to Plaintiff's claims, it was indispensable.

Where, as here, evidence is destroyed in bad faith (*i.e.,* intentionally or willfully), that fact alone is sufficient to demonstrate relevance. *Residential Funding Corp.,* 306 F.3d at 109. Because Mrs. Haltman acted willfully by tampering with QuickBooks and destroying evidence, relevance of the destroyed or altered documents should be presumed.[14] *Id.*

### POINT II.
### DEFAULT JUDGMENT IS THE ONLY ADEQUATE SANCTION

"Outright dismissal of a lawsuit … is within the court's discretion" and "is appropriate if there is a showing of willfulness, bad faith, or fault on the part of the sanctioned party." *West*, 167 F.3d at 779. Under these egregious circumstances, only a default judgment ensures the protection of the discovery process and is adequate to sanction the Defendants' spoliation.

An adverse inference, or other lesser sanction, cannot put the Plaintiff in "the same position [it] would have been in absent the wrongful destruction of evidence" by the Defendants. Since QuickBooks was the sole method of keeping Exeter's books and records (Roesser Aff., Ex. 1 at 106:6–12), its accuracy is crucial to Plaintiff's claims. There is simply no way to reconstruct QuickBooks as it would have looked had Mrs. Haltman and her brother not tampered with it, and thus, there is simply no way for Plaintiff to reconstruct Exeter's true financial picture prior to the

---

14  Even if the Court finds the Defendants' conduct was only grossly negligent, relevance may still be presumed. *Zimmerman*, 2011 WL 1429221, at *24 ("Where a spoliating party has been grossly negligent, resulting in the loss of evidence, many courts have presumed relevance, although the presumption is not required."). Here, based on the plethora of preservation obligations that the Defendants wantonly ignored, such a presumption is warranted.

21

tampering.  No doubt this is what Mrs. Haltman wanted: to hide what was really going on with Exeter.

If Plaintiff were to have any hope of reconstructing Exeter's true financial picture, it would have had to have been on the basis of source documents.  Yet substantial amounts of data—including QuickBooks entries—were deleted, presumably by Mrs. Haltman, both just before and just after the bankruptcy was filed.  Of the 46,623 documents deleted in 2011 and 2012, more than 21,000 could not be recovered.  Fox Aff., ¶ 7.

While Plaintiff cannot say with certainty the contents of what was deleted—which of course is the purpose of deleting documents—it is undisputed that this was the one computer on which almost all Exeter business was conducted.  The Hard Drive contained in many instances Exeter's sole copy of promissory notes, QuickBooks entries, and email communications.  In fact, Mrs. Haltman has repeatedly testified that QuickBooks is the best evidence of Exeter's finances.  *See supra*, Argument § I.C.  She also recently testified in another adversary proceeding that she maintained no back-ups beyond what has already been produced to Plaintiff (Roesser Aff., Ex. 33 at 24:18-25-7), making the QuickBooks entries Exeter's only existing financial record.

These financial records are of paramount importance to Plaintiff, as these records are concededly the *only* source of information that speak to Plaintiff's claims, *i.e.*, the (mis)management of Exeter's corporate funds, fraudulent transfers, and preferential payments.  Moreover, Larry Frank admitted that he was asked to alter these crucial records by Exeter's president, Mrs. Haltman, and Plaintiff has simultaneously been denied the ability to compare the produced versions to any of the back-up version due to the Defendants' destruction and failure to preserve evidence.

When spoliation corrupts the relevant evidence to this degree, a terminating sanction is the only appropriate remedy. *Gutman,* 2008 WL 4682208, at *12; s*ee also, Fharmacy Records v. Nassar*, Nos. 08-1607, 08-2201, 2010 WL 2294538, at *4 (6th Cir. June 7, 2010) (affirming district court's dismissal of plaintiffs' case where, *inter alia,* the plaintiff had intentionally backdated certain files). Defendants "should not be permitted to evade liability for their conduct solely because of an absence of evidence for which they themselves are to blame." *De Xiong Pan v. Wei Plumbing, Inc.*, No. 12 CV 1781, 2013 WL 6053496, at *12 (S.D.N.Y. Nov. 13, 2013).

Indeed, terminating sanctions have been imposed in situations with much less egregious conduct. *See, e.g., Microsoft Corp,* 2008 WL 4179653, at *1, *4, *17 (adopting magistrate's report and recommendation that default judgments be entered where defendants failed to produce initial disclosures, respond to interrogatories or produce documents) (citation omitted); *Alexander v. Boscaino Auto Collision, Ltd.*, No. CV-11-3526, 2012 WL 4867507, at **1-2 (E.D.N.Y. Aug. 6, 2012) (magistrate's report and recommendation) (recommending dismissal where plaintiff failed to appear for deposition in violation of a court order and ignored a sanction requiring payment of expenses for failing to initially appear), *adopted*, 2012 WL 4867473 (E.D.N.Y. Oct. 15, 2012); *Baez v. Majuri*, No. CV-10-3038, 2013 WL 4434444, at **1-3 (E.D.N.Y. July 29, 2013) (magistrate's report and recommendation) (recommending dismissal for failure to prosecute where plaintiff repeatedly ignored court orders to appear for examination by defendants' medical expert). Further, dismissal is appropriate because Mrs. Haltman tried to conceal her spoliation. *Miller v. Time-Warner Commc'ns., Inc.*, No. 97 Civ. 7286, 1999 WL 739528, at *3 (S.D.N.Y. Sept. 22, 1999) (dismissing plaintiff's case where plaintiff had

destroyed documents and falsely testified about the destruction even though "defendants were not prejudiced by plaintiff's conduct").

### POINT III.
### IN THE ALTERNATIVE, PLAINTIFF IS ENTITLED TO AN ADVERSE INFERENCE

Should the Court deny Plaintiff's request for default judgment, an adverse inference is warranted in the alternative. "It is a well-established and long-standing principle of law that a party's intentional destruction of evidence relevant to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction." *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998).

A party acts with the requisite "culpable state of mind" such that an adverse inference is appropriate if it acted at least negligently when it destroyed documents. *Residential Funding Corp.,* 306 F.3d at 108. Furthermore, "[o]nce the duty to preserve attaches, *any* destruction of documents is, at a minimum, negligent." *Zubulake*, 220 F.R.D. at 220 (emphasis added & footnote omitted). Here, it is undisputed that the automatic deletions performed by Iron Mountain and GoDaddy were not suspended until January 2013. As a result, critical emails and back-up tapes containing the sole copy of Exeter's financial records were routinely destroyed and overwritten, pursuant to the vendors' normal procedures. At a bare minimum, therefore, this destruction of relevant evidence was negligent.[15] However, Defendants' conduct here has run

---

[15]   Multiple witnesses, including several Defendants, testified to the shoddy nature of Exeter's record keeping. *See* Roesser Aff., Ex. 1 at 153:9-25 (documents stored in parents' garage destroyed sometime after March 2009), 156:24-157:4 (Mrs. Haltman testifying that she is "unfamiliar" with the idea of document preservation); Ex. 2 at 91:20-92:4 (minutes of board of directors' meetings only "occasionally" kept), 24:12-24 ("voluminous" number of Exeter documents stored in the garage until they were thrown-out because cars could not get in); *Id.* Tr. 115:17-18 (testifying about "looseness of names, looseness of accounts"), 261:16-262:15 (testifying that he always worked on handshake deals), 267:14-21 (most of the time Exeter's interest in a piece of property would not be recorded with the country clerks out of "sloppiness"); Ex. 8 at 49:20-50:18 (Mrs. Cincinnato testifying that she would not save letters to her computer

Footnote continued on next page

the gamut from gross negligence to willful destruction of evidence, clearly satisfying the

culpability requirement.

### POINT IV.
### ADDITIONAL SANCTIONS ARE WARRANTED

Plaintiff respectfully submits that he is entitled to attorneys' fees and the costs of bringing

both the instant motion, as well as the fees and costs incurred investigating Defendants'

spoliation.

> [Attorneys' fees] may be appropriate to punish the offending party
> for its actions or to deter [the] litigant's conduct, sending the
> message that egregious conduct will not be tolerated. ....
> Compensable costs may arise either from the discovery necessary
> to identify alternative sources of information or from the
> investigation and litigation of the [ ] destruction itself.

*Zimmerman*, 2011 WL 1429221, at *34 (internal quotations omitted).  Additionally, "[a]warding

monetary sanctions serves the remedial purpose of compensating [the movant] for the reasonable

costs it incurred in bringing [a motion for sanctions]." *Pension Comm.*, 685 F. Supp. 2d at 471

(footnote omitted & brackets in original) (imposing monetary sanctions on thirteen spoliating

plaintiffs, including those whose conduct was negligent).  The Court should impose no less

of a sanction here.

### CONCLUSION

For all of the foregoing reasons, Plaintiff respectfully requests that the Court grant his

motion for sanctions and any other relief the Court deems appropriate.

---

Footnote continued from previous page
after having written them, nor would she keep hard-copies), 58:6-10 (no written policy for how
long documents should be retained).

Date: February 2, 2015                    ARNOLD & PORTER LLP

                                  By: /s/ John D. Roesser
                                      John D. Roesser
                                      399 Park Avenue
                                      New York, New York 10022
                                      (212) 715-1000

                                      *Special Litigation Counsel for Plaintiff
                                      Gary Herbst, Plan Administrator for
                                      Confirmed Plan of Exeter Holding, Ltd.*