UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
Official Committee of Unsecured Creditors        Case No. 13-cv-05475-JS-ASK
of Exeter Holding, Ltd.

                Plaintiff,

   -against-                                  **Affidavit in Opposition**

Linda Haltman, *et al*,

                Defendants.
-----------------------------------------------------------X

STATE OF NEW YORK  )
                            )ss:
COUNTY OF NASSAU  )

        Linda Haltman, being duly sworn, deposes and says:

        1.    I am a Defendant herein and am fully familiar with the facts and circumstances set forth in this affidavit.

        2.    I present this affidavit in opposition to Plaintiff's motion for an order, *inter alia*, finding that I engaged in spoliation by destroying evidence.

        3.    The Plaintiff has completely misrepresented the facts underlying the motion. Prior to turning over Exeter's computer to the Plaintiff in July 2013, I did not delete any data, including emails (other than spam or junk emails), from the computer that related to Exeter or its business operations, a point my counsel has been making to Plaintiff for more than a year. (Ex. Y.)

        4.    I also did not destroy or discard any paper records of Exeter relating to any of the transactions described in the Complaint. Apparently, my biggest mistake was not circulating a memo to Exeter's employees in December 2009 stating that a "litigation hold" was in place and that all documents and information relating to Exeter should be preserved. Putting aside that no one ever instructed me to issue such a memo, the fact is that as of December 2009, Exeter's active loan files

were stored at Exeter's New York office and maintained by me. (Ex. 24, pp. 63-67.) In addition, I was the only person at Exeter who used Exeter's computer to conduct business. After December 2009, I never discarded any active loan files and I never deleted any Exeter-related emails or data from the computer. Consequently, when Exeter paid for the computer's hard drive to be forensically copied for the Committee in 2012 (Exs, B and D), all relevant information regarding Exeter was still in the computer. Nothing presented by Plaintiff in the motion undermines the fact that Exeter preserved all relevant materials and information, period.

5. If Plaintiff had pointed to any item of information that previously existed that was not produced by Exeter and/or my husband and I during the course of (formal and informal) discovery, Plaintiff's motion might make some sense. However, Plaintiff does not identify any such previously existing relevant information. Rather, Plaintiff complains that emails and other computerized files were deleted and/or not backed-up and that I continued to use Exeter's computer after December 2009. These complaints, which Plaintiff has been voicing since 2012, do not provide a basis for sanctions.

6. Plaintiff insinuates that I wrongfully delayed turning over Exeter's computer to Plaintiff. As I expressed at the time, my issue with providing unfettered access to the computer resolved around my fear that extremely personal family information on the hard drive, including information relating to the mental health condition of my children, would find its way into the hands of the members of the Committee. Contrary to Plaintiff's claim, I did nothing wrong in continuing to use Exeter's computer after the bankruptcy filing. In fact, during the time that Exeter was a Debtor-in-Possession, Bankruptcy Judge Trust instructed me to continue to use the computer to prepare the reports that needed to be filed with the Bankruptcy Court.

7.     In relation to prior motions, I have expressed my frustration with the discovery process in this case, which has dragged on for years at great expense to me and my family. Among other things, I do not understand Plaintiff's focus on requiring my husband and I to produce documents that Plaintiff already possesses by virtue of the document productions made by Exeter in the bankruptcy case. (Ex. Z.)

8.     Similarly here, Plaintiff has taken actions that I believe are directed toward draining me and my husband of our limited financial resources, not obtaining evidence to seek to establish Plaintiff's claims at trial. Most obvious, in addition to refusing to produce the deleted files that he allegedly recovered from Exeter's hard drive, Plaintiff has steadfastly refused to make Exeter's original computer and hard drive and/or a readable version of the forensically copied Exeter hard drive available to my husband and I for inspection. Plaintiff's only concession has been to offer my husband and I access to the database that his computer consultants created to make the forensically copied hard drive readable. However, the $20,000.00 price tag attached to this inspection is beyond our means. Also, why should my husband and I have to pay to access a hard drive that Exeter paid to have forensically copied? I still don't understand why the hard drive that Plaintiff turned over to the Defendants in November 2012 was in a format that my current computer could not read. It appears to me that Plaintiff must have modified or altered the hard drive in some way to render it unreadable.

9.     Plaintiff's actions have left me to try to prove a negative -- that the files allegedly deleted from the hard drive are not relevant to this action. However, without access to Exeter's computer or the forensically copied hard drive, which Exeter paid for (Ex. D), my husband and I (and our expert) cannot definitely determine what types of files were deleted, much less the information contained in those files. This is extremely unfair. Plaintiff is playing a game of cat and mouse, not engaging in good faith discovery.

3

10. Plaintiff claims, through his expert, that over an 8-year period, I deleted 64,084 files comprising 17.03 GB of data. (Affidavit of Brian T. Cox, ¶ 7.) However, with the exception of 92 Quick-Books related files, neither Plaintiff nor his expert provides any insight as to the types of files that were allegedly deleted or the information those files contained. This omission is significant because, as explained by Leonard Weinstein in his accompanying affidavit, unlike data files, whose deletion may be relevant to a claim of spoliation, the deletion of program files or system files have no bearing on such a claim.

11. In 2011, Exeter's computer experienced issues, including being infected by a virus on at least one occasion. I do not recall exactly what Exeter, in conjunction with its computer consultant, Michael Lee, did to resolve the problems, but it likely involved a disk defragmentation and/or the installation of anti-malware software. In addition, from time to time, I changed programs in Exeter's computers, such as from Lotus Notes to Excel or from Outlook Express to Outlook. I also installed updated versions of QuickBooks from time to time. I cannot say that outdated and unnecessary, duplicative files were not deleted as a result of these updates. Since Exeter's desktop computer did not have unlimited capacity, I imagine this might have occurred. The deletion of such program files did not result in the destruction of any information that could be deemed arguably relevant to the claims in this action.

12. As explained by Mr. Weinstein, each time a virus or spyware is removed from the computer, a defragmentation is performed or programs are changed, the possibility exists that program files and system files may be deleted. However, such deletions did not result in the loss of any relevant evidence. (Weinstein Aff., ¶¶ 9-18.)

13. Of the 64,084 files that I allegedly deleted, Mr. Fox claims that 46,623 files were deleted between January 1, 2011 and October 2012. Mr. Fox does not identify the size of the

4

46,623 files. Instead, he claims that of the 46,623 files, 21,302 were "unrecoverable." (Fox Aff., 7.) This means that Plaintiff recovered nearly half of allegedly deleted files. However, in the motion, Plaintiff inexplicably fails to describe any of the recovered files. Compounding this omission, Plaintiff has refused to produce the recovered files, at least to the extent that they represent documents. (Ex. N.) This confirms my belief that I did not delete any relevant documents or data. Rather, program and system files were deleted that have no relevance to this action.

14. Plaintiff's complaints cannot mask the fact that Exeter preserved all information relevant to Plaintiff's claims and that all of the information was provided to the Plaintiff (or the Committee), either by Exeter in the bankruptcy case or by me in this action. Plaintiff's remaining argument, that I "tampered" with Exeter's QuickBooks by asking my brother to write down non-performing loans in August 2011, is nonsensical.

15. Plaintiff claims that upon being sued by the Lawrences for non-payment of promissory notes in December 2009, Exeter should have put in place a "litigation hold" to ensure the preservation of relevant documents.(PMOL, pp. 4-18.) However, prior to September 2012, when Exeter was advised by bankruptcy counsel to contact Iron Mountain and Go Daddy and request that any back-up deletion protocols be terminated, Exeter was never told to institute a litigation hold. (Ex. 25.)

16. Regardless, this Court cannot simply ignore that, in fact, all relevant evidence was preserved by Exeter, including all paper records and all computerized data. I know this because I was the person who, as of December 2009, used Exeter's computer and maintained Exeter's loan files, which were located at Exeter's New York office. After December 2009, I continued to use Exeter's computer, without deleting any data or documents relevant to Exeter. I also maintained all of Exeter's active loan files, which are the files at issue in this action. Those files have been produced,

5

together with all information in the Exeter computer that could be deemed relevant to this action. Plaintiff's argument to the contrary is based on pure supposition.

17. While I now understand the concept of a litigation hold, the fact is that without formally implementing a litigation hold, Exeter, through me, preserved all relevant loan files and electronic data.

18. Plaintiff urges this Court to sanction me because prior to October 2012, I did not instruct Go Daddy, the web-based email service provider used by Exeter, to stop the automatic deletion of Exeter's internet-based emails and because prior to January 2013, I failed to instruct Iron Mountain to stop automatically over-writing the back-up copies of the Exeter hard drive.

19. As I testified to repeatedly, prior to October 2012, I was unaware that Go Daddy had an automatic deletion policy and that Iron Mountain did not maintain unlimited back-up tapes. Since no one instructed me to call Go Daddy and Iron Mountain, I had no reason to call them.

20. Regardless, my failure to call Go Daddy and Iron Mountain has not frustrated Plaintiff's search for relevant facts in this action. By their nature, Go Daddy and Iron Mountain provide back-up services. Since I preserved all relevant emails and electronic data relating to Exeter, Plaintiff has no need of the back-ups, which, if they existed, would merely confirm what I already know, that every document and piece of data relevant to this action has been turned over to Plaintiff. Nothing advanced by Plaintiff has undercut my belief in this regard. Plaintiff has merely identified deleted files and asked this Court to assume that the files contained relevant data. They didn't.

21. Regarding QuickBooks in particular, Plaintiff alleges that in July 2011, I asked my brother Larry to "alter and backdate QuickBooks entries, thereby "deliberately misstating" Exeter's financial records. (PMOL, p. 2.) This is a complete fabrication. I tasked Larry to write off certain non-performing loans (hereinafter "Accounts"). Larry did so. That is all that occurred. (*See*

6

Exs. R and S.) The general journal entries reflecting the writing off of these accounts were posted on August 11, 2011. (*Id.*) Nothing was backdated or misstated.

22. As I look back, it appears that when I told Larry that he should have written off the accounts "as of 9/30/10" (Ex. 28), I may have been mistaken, at least as to the year. Since Hallmark's financial year ended on September 30, it makes sense that I sought to tie the writing off of the Accounts to September 30. However, I think my reference to 2010 was a mistake and that I actually intended to refer to 2011. I believe that might be the case because under generally accepted accounting principles, assets can only be written off in the year that a "taxable event" -- such as a foreclosure of the property underlying the loan or a loss on the sale of the property -- occurs. In the case of the Accounts, that was, for the most part, in 2011.

23. My belief is further supported by the fact that after Larry Frank made the requested journal entries for the Accounts known as Begonia Court, 171 Carica Road and Shortpath, I reversed the write-offs because as of August 2011, the real properties underlying these Accounts continued to be owned by the respective Property Corporations. (Ex. S.) As a result, the balances on these Accounts remained as assets on the books and records of Exeter. (Ex. R.) Again, nothing was deleted or destroyed. In fact, since all data regarding any particular Account is contained in a single data file, I am not sure how I would deleted portions of a file. Undoubtedly, if I had done something like that, the accountants would have noticed, either by comparing past financial statements or looking at Exeter's bank statements.

24. In claiming that I "tampered" with QuickBooks, Plaintiff ignores that Larry's journal entries were all posted on August 10, 2011. (Ex. S.) Nothing was backdated. Plaintiff has not identified a single item of financial information regarding the Accounts that was not contained in the QuickBooks program that resided on Exeter's hard drive at the time that a forensic copy of

7

Exeter's hard drive was made for Plaintiff in October 2012. Exeter's action in writing off non-performing loans did not, in any way, result in the destruction, alteration or loss of any evidence, nor did it render Exeter's financial records incomplete, misleading or inaccurate. In fact, Plaintiff is suing me for $10 million in damages based on the claim I committed fraud and breached my fiduciary duty by writing off of the uncollectible loans. (Complaint, ¶¶ 176-194.) How can Plaintiff sue me based on evidence that Plaintiff claims doesn't exist because I destroyed it?

25. Plaintiff also alleges that I deleted 97 QuickBooks files over 9 years, including 27 on November 21, 2011. (Fox Aff., ¶ 9.) I deny having deleted or removed any relevant information from QuickBooks in 2011 or at any other time. (Ex. 24, p. 88-89.) As Mr. Weinstein explains, Plaintiff's expert has identified several QuickBooks file extensions associated with Exeter's QuickBooks program, only two of which are data files. (Weinstein Aff, ¶¶ 16-17.) However, Plaintiff's expert does not allege that I deleted any data files, just that unidentified QuickBooks files were deleted. If the deleted files did not contain data, they could not contain evidence.

26. I do not know whether the deletions that Plaintiff's expert found related to Exeter having upgraded its QuickBooks to the 2012 version. (Ex. 24, pp. 23-24.) Regardless, if pertinent data was deleted from QuickBooks, Exeter's checks, bank statements and financial statements, which have been in Plaintiff's possession since 2012, would not agree with the entries in QuickBooks, which also have been in Plaintiff's possession since 2012. (Ex. 24, pp. 45-46.) Plaintiff has not identified a single check or bank transaction that does not reconcile with the information contained in QuickBooks. Mr. Weinstein's analysis fully supports my testimony that I did not delete any information regarding Exeter's business from QuickBooks.

27. Plaintiff has been contemplating making this motion since September 2012 (Ex. 20), and has spent the past 2+ years seeking to find evidence to support the motion. Despite not

having found any, Plaintiff filed this motion, offering this Court baseless conjecture and theories regarding deleted files and back-dated QuickBooks entries. Plaintiff's conjecture and theories do not hold water. Once again, my husband and I have again been forced to expend our limited resources on nonsense. Plaintiff should be reimbursing my husband and I for the legal fees that we have incurred to defend against this motion, not the other way around.

28. Plaintiff alleges that after testifying in March 2014 that I did not possess any additional relevant materials, I produced "eight boxes" of relevant materials. (PMOL, p. 20.) Plaintiff is misrepresenting the facts.

29. While I did produce eight boxes of documents to Plaintiff in March 2014, the boxes contained documents that Plaintiff already had and/or that were not relevant to any claim in this action. In particular, three of the boxes contained promissory notes and bank statements already in Plaintiff's possession. (*See* Ex. F.) The remaining five contained corporate kits of certain of the Property Corporations. (*See* Exs. G, H, I and J.) The corporate kits consist entirely of blank forms and filing receipts from the New York State Division of Corporations. (*See* Ex. K.) The filing receipts establish that nearly all of the corporate kits correspond to Property Corporations formed prior to 2006. (*Id.*) Thus, even if the corporate kits were not blank, they could not contain any information that is relevant to any of the claims at issue in this lawsuit.

30. Thus, my production of the eight boxes of documents does not prove that I disregarded my discovery obligations. It proves that Plaintiff is abusing the discovery process.

31. Based on the foregoing, the motion should be denied in its entirety.

_____
Linda Haltman

Sworn to before me this
9th day of March, 2015.

_____
NOTARY PUBLIC

MARC J. WEINGARD
Notary Public, State of New York
No. 02WE6036430
Qualified in Suffolk County
Commission Expires January 24, 2018