Norma E. Ortiz
Ortiz & Ortiz, L.L.P.
32-72 Steinway Street, Ste. 402
Astoria, New York  11103
Tel. (718) 522-1117
Fax (718) 596-1302
email@ortizandortiz.com

---------------------------------------------------x
The Official Committee of Unsecured Creditors
of Exeter Holding, Ltd.                                                    13–cv–05475–JS–AKT

 against

Linda Haltman, et al.,

                                 Defendants.
---------------------------------------------------x

## **DECLARATION OF LAWRENCE FRANK**

      Lawrence Frank, a defendant in the above-captioned action, hereby declares as follows in Opposition to the Motion for Summary Judgment brought by the above-captioned Plaintiff:

      1.     I was born in 1959 and have resided in the State of California since I attended graduate school there.  I obtained a mechanical engineering degree from Duke University and a Masters Degree from Stanford University.  I worked in various positions for different companies after I graduated from Stanford that included engineering, mechanical, and marketing positions. I began working with my father Arnold Frank's company, Exeter Holding Ltd. ("Exeter"), in the late 1990's.

      2.     I served as a consultant to my father and assisted him with his computing needs. In some instances, I consulted on issues related to engineering and security for homes that were built by my father and the corporations he established.  I worked between 10 to 15 hours a week for my father.  I received $5,000 a month for my consulting services from approximately 2006

through 2011.  I did not have any other regular source of consulting or employment income during this period of time.

3. I had no management or operational role with Exeter, and was never a shareholder of the company.  My father controlled all of the business and legal decisions of Exeter.  He informed me that he was advised by lawyers and accountants during all of the years I consulted for him, and I spoke to professionals over the years on occasion about Exeter.  My sister Linda Haltman worked in the office in New York with my father.  But since I lived in California, my role was very limited.  In fact, my sister Linda refused to work with me on a regular basis.

4. My father began developing properties through Exeter.  In most instances, he would cause the company to buy a building lot, build a home, and sell the property at a profit.  He informed me that he was advised by his accountants and lawyers to set up separate entities for each of the development properties.  In some instances, he would designate me as a shareholder of an entity, or one of three shareholders of an entity with my two siblings.  However, I had no role in the selection of the properties or for the funding of a project.  I had no say in the ownership distribution of the corporations.  My father would send me documents to sign and I would comply with his requests.  Sometimes Linda would send them on his behalf.  I viewed myself as a nominal interest holder, since I never actually received any shares in the corporations and made no business or legal decisions in connection with the properties.  The corporations were listed on Exeter's balance sheet as assets of the company, and as far as I knew, they were sub-chapter s corporations and under the complete dominion and control of Exeter.  There is no dispute that the corporations were listed as assets of Exeter in its balance sheets.

5. When a property was sold, or a mortgage was taken on a property, my father

made that decision and my father determined how the proceeds of any sale would be distributed. On a small number of occasions, including in connection with a corporation called Short Path, I obtained a mortgage for an entity I do not believe I had an interest in at my father's request. I was told that Exeter would earn at least 21% interest on any funds lent to the corporations to develop a property. Before the drop in the real estate market, my father informed me that the projects were profitable for Exeter.

6. I had assumed that my father used these entities for estate planning purposes. But he also explained to me more recently that building properties through the use of separate entities saved Exeter in costs for construction insurance. I had no reason to believe that anything asked of me was not done pursuant to the advice of Exeter's accountants and lawyers, so I complied with my father's requests. I was provided virtually no paperwork in connection with the entities, other than a few of the initial formation documents that needed my signature, or for mortgage loan applications. In fact, I learned during this action that my name had been signed to documents without my knowledge. Other than consulting with my father, I would assist my father by guaranteeing financing for the projects.

7. An investment account was established for me and my siblings in Exeter. In the few instances in which I received part of the profit of a project, those funds were credited to my investment account in Exeter. In other words, the funds were not paid to me directly and were put back into Exeter's accounts. My father determined the amount of my ownership in the property corporations and he determined whether or not any profit from a project would be credited to me or another sibling. I had no control over these decisions: it was my father's business and he ran it.

8. Since my father formed all of the corporations, and made all of the legal and

financial decisions in connection with the corporations I was involved in, I do not possess the books and records for any of these entities. Again, since they were under the control of Exeter, and Exeter was advised by lawyers and accountants, I had no reason to question this business model.

A. <u>Inadequate and Inaccurate Information Contained in the Summary Judgment Motion</u>

9. I do not believe it is appropriate for the Plaintiff to seek summary judgment in a case of this nature. I have been provided with the following financial documents as evidence that the Court should award the Plaintiff a judgment against me in the amount of millions of dollars:

    a. <u>Exhibit 5 to Motion for Summary Judgment</u>: A computerized print-out of consulting fees to me in 2010 and 2011. The list merely contains a date and amount and lists me as a payee. Although I admit receiving monthly consultation fees, I do not believe the list is accurate. Without copies of the checks, I do not find this print-out reliable and accurate. The amount asserted in the list is $95,000 that was paid from November 2009 through July 2011. However, I admit to receiving $90,000 of the $95,000 contained in the list. These checks were not prepared by me and these books were not maintained by me.

    b. <u>Exhibit 6 to Motion for Summary Judgment</u>: A computerized printout listing two checks paid to the Arnold and Sondra Frank Irrevocable Family Trust ("ASF Trust") in 2011 totaling $154,000. These checks were not prepared by me, and I did not receive them.

    c. <u>Exhibit 15 to Motion for Summary Judgment</u>: A computerized print-out of a list of checks purportedly written on behalf of two entities, Fox Lane and

4

Maplewood Associates, that were purportedly owned by me. These checks were not prepared by me and I did not receive them. I can neither confirm nor dispute the accuracy of this list and I did not benefit personally from the payments made to third parties. Moreover, there is no information on this list, as discussed in more detail below, that addresses the income received by Exeter from these entities. For example, my father informed me that the Fox Lane project was wildly successful and Exeter was paid in full, with interest, for all of the monies invested in the project. Since there is no corresponding information regarding income to the entities, this list of payments is not reliable and accurate evidence of the transactions involving these entities and should not be relied upon by the Court to render judgment.

d.  <u>Exhibit 16 to Motion for Summary Judgment</u>: A computerized print-out of a list of checks purportedly written on behalf of four corporations the Plaintiff refers to as the Frank-Haltman Sibling Entities. There are no checks provided. There are no checks written to me. There are no checks listed that were signed by me. There is also no record of any income received by the entities listed, or any monies paid to Exeter. I had no involvement in the preparation of these payments, and can not tell who made them. I do not believe the Court can render a decision based upon this inadequate and unreliable information on a motion for summary judgment.

e.  <u>Exhibit 21 to Motion for Summary Judgment</u>: a copy of a series of emails that demonstrate, among other things, my attempts to comply with the Plaintiff's discovery requests and to ensure I can provide information regarding three

5

payments I received in 2009. In one email, I listed the corporations the Plaintiff asserts I had an interest in and asked my sister Linda if she has any records related to the entities that pertain to me. These emails support my assertion that I did not control any of the corporations, and did not have the books connected to them.

      f.   <u>Exhibit 22 to Motion for Summary Judgment</u>: a letter from former bankruptcy counsel to Exeter that states it contains a list of possible affiliates of Exeter.

It would be wholly unfair for the Court to enter a monetary judgment against me based upon an incomplete set of records and these computer printouts under the circumstances of this case.

B.  <u>I Never Used Exeter as a Personal Piggy Bank</u>

      10.   The Plaintiff has improperly lumped me in a group with all of my family members and described me as responsible for all of the actions taken by other family members. That characterization is completely inaccurate. Although as a family member, I may be an insider as that term is defined in the Bankruptcy Code, I did not participate in and had no control over Exeter's business and financial decisions. Despite the Plaintiff's accusation that the insiders used Exeter as their personal bank account, and had many personal expenses paid on their behalf, that allegation is false when applied to me, and there is no evidence provided to support this allegation against me.

      11.   I received three types of income or consideration from Exeter at my father's direction and approval: my consulting fees, interest payments from the Barbara and Murray Cohen Trust ("BMC Trust"), and interest payments from my investment account in Exeter. My personal expenses were not paid by Exeter, and any profit on a project was credited to my Exeter

investment account. My medical and disability insurance payments were paid by me since 2005 or 2006.

12. The BMC Trust was created by my grandparents. My parents were the trustees and my siblings and I are the beneficiaries. My father told me in the early 2000's that he invested all of the $4 million dollars in the BMC Trust in Exeter. Since Exeter was profitable for decades, the BMC Trust – and other investors – earned interest on their investments. My father would never let me withdraw principal from the BMC Trust. When he paid me interest from the trust, I presumed he paid it from Exeter. However, these payments were interest on the funds we inherited from our grandparents that had been invested in Exeter.

13. The Plaintiff asserts that I looted Exeter for personal gain. But there is no evidence of that fact because it is not true. All of the exhibits I reviewed show no payments to me, or that benefitted me, other than the payments I refer to in Paragraph 11: consulting fees, interest payments on my investment accounts, and interest payments on my interest in the BMC Trust. Even if I wanted to take money from Exeter – which I did not – I had no control over Exeter's decision making and check writing.

C. The Allegations That I Owned Some or All of the Interests in the Property Corporations Are Not Accurate and Not Substantiated

14. The Plaintiff alleges that I had an interest in 14 corporations that were created by Exeter and that I participated in looting these entities for my own personal gain. I dispute these assertions and I do not believe that the Plaintiff has substantiated its claims for the purpose of this motion. As set forth below, the following is my description of my connections to these entities:

a. <u>124 New York Avenue</u>: I possess no shares of this entity, no documents in connection with this entity, and never heard of it until this lawsuit was brought. I wrote the State of New York for information or documents and did not receive any. I do not believe I ever had an interest in this entity, ever participated in its formation, and I never received any funds from this entity or from Exeter in connection with this entity. I saw no evidence of my ownership in the summary judgment motion.

b. <u>22 Bridge Lane</u>: I possess no shares of this entity and no documents in connection with this entity. I do not believe I ever had an interest in this entity, ever participated in its formation or decision-making, and I never received any funds from Exeter from this entity or the entity directly. I saw no evidence of my ownership in the summary judgment motion.

c. <u>22 West Hills</u>: I believe this is listed in error, and my sister Linda was the 100% shareholder of this entity. I possess no shares of this entity and no documents in connection with this entity. I do not believe I ever had an interest in this entity, ever participated in its formation or decision-making, and I never received any funds from Exeter from this entity or the entity directly. I saw no evidence of my ownership in the summary judgment motion.

d. <u>29 Mill Lane</u>: I possess no shares of this entity and no documents in connection with this entity. I do not believe I ever had an interest in this entity, ever participated in its formation or decision-making, and I never received any funds from Exeter from this entity or the entity directly. I

saw no evidence of my ownership in the summary judgment motion. I may have signed the corporate formation sheet, but I had no further involvement with this entity.

e. <u>3 Lewis Lane</u>: I participated in this project. I guaranteed a mortgage for the construction of the project at my father's direction. I received no money from this entity, despite the allegation contained in Paragraph 233 of the Complaint that I received funds to pay my personal expenses from this entity. Linda was the president of this entity, and I believe it was formed with the assistance of counsel. I saw no evidence in the motion that demonstrates to the Court that I received any consideration or benefit from this entity.

f. <u>Begonia</u>: I possess no shares of this entity and no documents in connection with this entity. During discovery, I saw a copy of formation documents that list me as a 33% shareholder, and saw my name was forged on the document. I do not believe I ever had an interest in this entity. I never participated in its formation or decision-making, and I never received any funds from Exeter from this entity or the entity directly. I saw no evidence of my ownership in the summary judgment motion.

g. <u>Eden Rock</u>: I do not recall signing any documents in connection with this entity other than serving as a guarantor of a mortgage. I possess no shares of this entity and no documents in connection with this entity. I do not recall participating in the formation of this entity and did not participate in

any decision-making in connection with this entity.  I never received any funds from Exeter from this entity or the entity directly.  I saw no evidence of my ownership in the summary judgment motion.

h. <u>Maplewood</u>:  Maplewood has a distinct history that I learned after this action was commenced.  I recall serving as a 1/3 shareholder with my siblings in this entity in 2004.  A lot was purchased, a house was built, and the home sold for a profit.  All of Exeter's loans were repaid, including the 21% interest it charged for its loans.  I received funds that were placed in my Exeter investment account.  My father decided the amount of the profit paid to my account.

After the lawsuit was filed, I discovered that the entity was used to build a second home on another lot, which was an unusual practice for Exeter.  Apparently that project failed, and resulted in a loss.  I had no knowledge of this second project, and did not participate in it in anyway.  I received no money or benefit from this second project, and had no hand in its creation.

i. <u>13 Mill</u>:  I possess no shares of this entity and no documents in connection with this entity.  I do not believe I ever had an interest in this entity.  I did not participate in its formation or decision-making, and I never received any funds from Exeter from this entity or the entity directly.  I saw no evidence of my ownership in the summary judgment motion.  I read in a report prepared by the creditors' committee that this was a profitable project, and Exeter was paid in full.

j. <u>Fox Lane</u>: I believe that this entity is the perfect example of why the Court can not rely on the information submitted to the Court by the Plaintiff in support of its request for summary judgment. Fox Lane was very profitable for Exeter. If I recall, the creditors committee acknowledged in its report that the project yielded over a million dollars in profit for Exeter. Exeter was fully repaid, with interest, and I received $170,000 in my Exeter investment account. My father determined the amount of this payment. I received no money directly from Fox Lane or Exeter, other than the credit into my investment account. I believe this property was sold in 2006.

I saw no mention in the summary judgment, or the exhibit submitted by the Plaintiff, of the profit made by this entity. This demonstrates the inaccuracy of the exhibits and the evidence submitted to the Court by the Plaintiff.

k. <u>Carica Road</u>: I was told that a lot was purchased by this entity and no house was built on this property, but I have no personal knowledge of these facts. I possess no shares of this entity and no documents in connection with this entity. I do not believe I ever had an interest in this entity, ever participated in its formation or decision-making, and I never received any funds from Exeter from this entity or the entity directly. I saw no evidence of my ownership in the summary judgment motion.

l. <u>Laurel Hill</u>: I do not believe that this entity ever purchased property and ever suffered a loss for Exeter, pursuant to my conversations with my

    father.  I possess no shares of this entity and no documents in connection with this entity.  I do not believe I ever had an interest in this entity, ever participated in its formation or decision-making, and I never received any funds from Exeter from this entity or the entity directly.  I saw no evidence of my ownership in the summary judgment motion.

  m. <u>Osgood Place</u>:  I do not believe that this entity ever purchased property and ever suffered a loss for Exeter, pursuant to my conversations with my father.  I possess no shares of this entity and no documents in connection with this entity.  I do not believe I ever had an interest in this entity, ever participated in its formation or decision-making, and I never received any funds from Exeter from this entity or the entity directly.  I saw no evidence of my ownership in the summary judgment motion.

  n. <u>Connecticut View Drive</u>:  I do not believe that this entity ever purchased property and ever suffered a loss for Exeter, pursuant to my conversations with my father.  I possess no shares of this entity and no documents in connection with this entity.  I do not believe I ever had an interest in this entity, ever participated in its formation or decision-making, and I never received any funds from Exeter from this entity or the entity directly.  I saw no evidence of my ownership in the summary judgment motion.

15. I played no role in the decision to form these entities, purchase the lots, finance the projects, or take any action in connection with the entities.  It is important to note that my parents had invested all of their personal assets in Exeter, and they invested all of the money my grandparents left to them and to me and my siblings.  It was in our interest to ensure that Exeter

operated profitably. At least in my case, I had no access to funds unless Exeter was profitable and I could obtain my interest payments.

D.  I Did Not Aid and Abet In the Breach of Fiduciary Duties

16. The Plaintiff has accused me of aiding and abetting in the breach of fiduciary duties by officers and directors of Exeter because of Exeter's transfer of funds to the property corporations. The allegation is false, and is not substantiated by the evidence submitted. First, the Plaintiff's have failed to establish how much money Exeter, in fact, lost in connection with the property corporations and what connection that has to my participation and conduct. The documents submitted are incomplete and inaccurate, and should not be relied upon by the Court to make such a finding. Second, the Court would have to find that the Plaintiff has demonstrated that I knowingly and intentionally assisted in conduct that I knew was a breach of fiduciary duty, and it has not done so. In the few projects in which I participated, I did what I thought was beneficial to make a profitable project for Exeter and the investors, and nothing more. I believed that everything I did in connection with Exeter was done at my father's request, and done under the advice and assistance of lawyers and accountants. Moreover, in my limited role outside of Exeter's office, I did not have access to the daily operations and the books and records of Exeter.

17. I do not dispute that on one occasion, I was asked to make corrective entries in Exeter's Quickbook records and change the year that loans were closed on some accounts. I did not understand the import of this request at that time, but I agreed to help and cooperate. I went to a friend of mine that is a Quickbooks consultant to ensure that I did not make any mistakes. In connection with eight properties, I was asked to write down the value of the of the properties to zero because they were no longer assets with value, due to either the sale of the property or a loss of the property. My friend assisted me in making what she called journal entries, to adjust

13

the information. She explained that making a journal entry does not change past information, so it does not alter the historical information contained in the books. I believed that these entries did not remove any information that had previously been entered in the books, and was appropriate.

E. I Invested Over $500,000 of My Personal Funds in Exeter from 2006 through 2009

18. From 2006 through 2009, I invested $566,000 from my personal funds in Exeter. Annexed hereto as Exhibit A is copy of some of the bank statements and documentary evidence that supports this assertion. Most of the payments I received from Exeter for trust interest and interest on my investment account stopped in early 2009. After July 2009, virtually all of the payments I received from Exeter were for my monthly $5,000 consulting fees. Those consulting fees were paid to me virtually every month since prior to 2006 and were paid in the ordinary course of Exeter's business. Most of the payments made to me from Exeter were paid to me while Exeter was solvent. I received approximately a total of $85,000 in consulting fees in 2010 and 2011 as compensation for my consulting services.

19. I very much oppose the Court permitting the Plaintiff to continue to create the unnecessary expense and hardship caused by the action against me. The Plaintiff has known for years that I dispute most of the material facts alleged in the complaint and motion as they pertain to me. Yet it brought this motion, asserting that there is no dispute over the material facts. Moreover, I have made clear to the Plaintiff for years that I was not part of the inner circle of my family members in connection with Exeter. In fact, I was excluded and marginalized from the family business, other than helping my father with engineering and computer matters. I was not kept abreast of the state of the business, and was not privy to any inside information of the

business. For this reason, the Court should not countenance the Plaintiff's request for summary judgment and permit a trier of fact to determine the truth of what occurred.

      I declare under the penalty of perjury that the foregoing is accurate and true to the best of my knowledge.

San Francisco, California
July 12, 2019

*S/Lawrence Frank*
Lawrence Frank
